## BARNEY *v.* LEEDS.

The appraisal of a committee setting off a debtor's homestead upon the levy of an execution is conclusive upon the question of its value, until invalidated by some proceeding brought for the purpose of vacating or revising the record thereof. It cannot be called in question upon a subsequent proceeding for partition between the debtor and his creditor, to whom the residue of the estate has been assigned.

Whenever the estate of tenants in common is practically incapable of division by assigning to each owner thereof his equal portion in severalty, he cannot be compelled, by force of the provisions of sec. 25, ch. 228, Gen. Stats., either to sell his own share or purchase that of his co-tenant; but, in such a case, resort may be had to a court of equity, which has power to compel a sale of the entire estate, and order distribution of its proceeds upon equitable principles.

PETITION FOR PARTITION, under the statute, by Eleazer Barney against Carey Leeds. At the March term, 1873, there was judgment that partition be made, and, by agreement of the parties, N. B. Felton, Esq., alone, was appointed a committee to make partition.

At the September term, 1873, his report comes in, wherein he finds (1) that the premises cannot be divided without great prejudice; (2) that the value of the whole, September 22, 1866, was $800; (3) that on said twenty-second day of September, 1866, said Barney's interest in the premises accrued to him by the levy of an execution thereon; (4) that the right of said Leeds therein is a right of homestead existing at the time of said levy; (5) that the whole premises were appraised at $600 in making said levy; (7) that said Leeds, at the hearing before said Felton, demanded that the whole or a part of said premises should be set off to him by metes and bounds as and for a homestead, and claimed that said Barney was estopped from showing that the value of said premises was more than $600 at the time of said levy; (8) but the committee recommends " that the whole of said premises be assigned

to said Barney, he paying to said Leeds, or securing to him in such manner as the court may order, the sum of $500 and interest thereon, unless said Leeds shall pay to said Barney, or secure to him in such manner as the court may order, the sum of $300 and interest thereon, or $100 and interest thereon, whichever of said sums the court may direct—in which case I recommend that the whole of said premises be assigned to said Leeds; (9°) subject to the exception of said Leeds, said Barney was permitted by the committee to testify as to his opinion of the value of said premises at the time of the levy, that it was much more than the sum at which they were appraised; and the committee reports that if said Barney's opinion in reference thereto was not com&#8203;petent, then he appraises the same at $600.

As to the qualification of said Barney to give such opinion, the committee finds certain facts, which were referred to the court and which appear in the opinion.

The defendant moved that the report be set aside, and also that it be recommitted, and filed eleven objections in writing thereto, as follows:

I. The plaintiff at the hearing before said committee failed to show himself competent, either as an expert or otherwise, to give an opinion as to the value of the premises bounded, described, and appraised by the levy of September 22, 1866.

II. The plaintiff's rights depend upon and are measured by said extent, of which the appraisal was an integral part, and by which, as the court have decided (51 N. H. 285), "the whole estate" was "appraised" "at $600." The committee, in substance, reports what was true, that there was no testimony before him, except that of the plaintiff, tending to show that the premises were worth at the date of the levy more than $600, and that he found the premises to be worth more upon the unsupported opinion of the plaintiff,—he (subject to the defendant's exception) having testified that, at the time of the completion of the levy and the appraisal, the entire premises levied upon were worth $1000.

The plaintiff cannot be permitted by his opinion to diminish the defendant's share and add $400 to the $100 set off to him by his own appraisers, by showing that they made a false or fraudulent appraisal.

III. The plaintiff is estopped from contradicting by his own opinion the appraisal, by men of his own selection, upon which his title rests.

IV. The order of the court (51 N. H. 287) was, that the defendant's share should be set out to him "by metes and bounds." The order of the committee, that the defendant should buy or sell real estate, contradicts and is in violation of the mandate of the court.

V. The defendant, under the homestead act, had the right to have set off to him "a homestead of the estate of the debtor, such as he may select, not exceeding $500 in value." So far as was in human power to do it, under the circumstances of the case—for it was beyond his power to foresee what values the committee might put upon the different parts of the premises—the defendant, at the hearing, made that selection or election. Neither the committee nor the court, by a

fair construction of the two statutes, has the power, under the statute authorizing an assignment, to destroy the right of selection which the homestead act gives the defendant.

. VI. Sec. 25 of ch. 228, Gen. Stats., is permissive and not mandatory.

VII. The phrase " one of the owners " must be construed to mean the same as one of the petitioners.

VIII. This statute gives no power to compel a defendant tenant in common to buy real estate.

IX. It gives no power to compel him to sell his real estate.

X. The statute gives no power to compel a conveyance.

XI. If the statute confers upon the committee or the court the power to compel the defendant to buy the plaintiff's property and pay him $300, or to compel the plaintiff to buy the defendant's property and pay him $500, it is unconstitutional and void.

The questions of law thus raised were transferred for the consideration of the full bench.

*Murray*, for the plaintiff.

I. The plaintiff was a competent witness; he had bought and sold land near these premises at or about the time of levy; he knew of other sales of land near these premises at or about the same time. See committee's report of facts. Gen. Stats., ch. 209, sec. 24. He was a qualified witness, in the opinion of the committee, to judge of such value.

II. The plaintiff was not estopped from showing the value of the premises after the committee found that the premises could not be divided without great prejudice or inconvenience. What is the meaning of estoppel? An estoppel is a preclusion of law, which prevents . a man from alleging or denying a fact, in consequence of his own previous act, allegation, or denial of a contrary tenor. Steph. Pl. 239. Lord Coke said,—" An estoppel is where a man is concluded by his . own act or acceptance to say the truth." Co. Lit. 352 *a*. Blackstone defines an estoppel to be " a special plea in bar, which happens where a man hath done some act or executed some deed which estops or precludes him from averring anything to the contrary." 3 Com. 308. The law authorized the plaintiff to appoint one disinterested freeholder in the county as appraiser, the sheriff one, and the debtor one; and if the debtor refuses or neglects, the sheriff is then to appoint. They go on and make an appraisal, which, if it is too small, the debtor has the right to redeem within a year. Afterwards it becomes material for the creditor to show the true value of the premises. He has appointed one disinterested freeholder only: now what act has he done which precludes him from showing the truth? The plaintiff has not been guilty of representation or concealment of material facts, upon which the defendant has been induced to act,—both essential elements in the question of estoppel. All the elements of estoppel are wanting in the case at bar, either by deed, judgment, or *in pais;* no. question of estoppel can

arise, for the estate of both is fixed by law; the defendant has an estate of $500 in value, and the plaintiff the residue. The court say, in *Barney* v. *Leeds*, No. 2, that the share taken and the share left are fixed by law,—the debtor to have $500 in value, and the creditor the residue. The precise quantity of the estate of each is fixed by law, and is ascertainable at the option and upon the application of either tenant in common of the entire estate for a partition of it.

III. The plaintiff and the defendant were tenants in common, and the court say that under Gen. Stats., ch. 228, the tenant, or the demandant, may cause partition to be made. *Barney* v. *Leeds*, 51 N. H. 281. The committee is to be governed by the provisions of said chapter. He upon his oath finds that the estate is so situated that it cannot be divided so as to give each owner his equal share therein without great prejudice or inconvenience. His duty was plain, for he had written instructions in his commission to be governed by said statute.

IV. The defendant holds under the act of 1851, and claims that he is entitled to a homestead by metes and bounds; but sec. 4 of the act of 1851 provides, that when the premises cannot be divided without injury and inconvenience, an appraisal of the whole value thereof is to be made, and, unless the execution debtor pays to the officer the surplus over and above the $500 within sixty days, the premises are to be sold. The same is done here in substance. He can have the whole by payment of $300; but if he refuses, then the plaintiff may take it and pay him $500,—so that in effect the defendant's right is not changed, and stands by these proceedings as well as by the other. The act does not contemplate that a debtor shall have homestead in all cases by metes and bounds, only when the premises can be divided without injury or inconvenience. Com. Stats., ch. 196, sec. 4.

V. The phrase "one of the owners" means one of the owners. See Commrs. Supp. Rep., p. 11, where they say "erase 'petitioners,' and insert instead thereof 'owners.'"

VI. Partition is a matter of right. *Morrill* v. *Morrill*, 5 N. H. 136; *Pickering* v. *Pickering*, 20 N. H. 541. And there can be no constitutional objection, for such were the law and practice before the adoption of the constitution. See act of February 4, 1789. Sec. 25 of ch. 228 is like the act of 1789. See Constitution, art. 90. *Mayo* v. *Wilson*, 1 N. H. 56; *State* v. *Rollins*, 8 N. H. 550; *Pierce* v. *State*, 13 N. H. 536.

*Shirley*, for the defendant.

This case comes up upon the defendant's motions to recommit, and to set aside the report of the committee appointed to make partition of the identical premises bounded, described, and set off to this plaintiff, subject to the homestead right, as set forth in *Barney* v. *Leeds*, 51 N. H. 254, 255, 281.

This court in this case has decided that these parties are tenants in common. Partition between tenants in common was unknown before the Statute 31 of Henry VIII.

The report finds that " It was also agreed that the premises, of which partition was sought, were the same premises which were the subject of litigation in the case reported in the fifty-first volume of the New Hampshire Reports, page 254."

The defendant owned the premises, occupied them with his family as a family homestead until the death of his wife in 1858, and still has the entire right to the same, except so far as that right has been limited by the extent of the plaintiff upon said premises, which was completed September 22, 1866.

The committee had the hearing upon the premises, and had full knowledge of the fact that the defendant had never remarried, but occupied the same alone as his homestead.

The plaintiff's rights depend alone upon the extent, and must be measured by it.

The facts stated in the former cases were by agreement of parties made a part of the case before the committee, as far as they went, and by his report are made a part of this case.

The report finds that " It was agreed that said Leeds was not present at the time of the levy, and took no part therein, and made no application to the officer making the levy in relation to a homestead, and selected no appraiser." This agreement was made at the close of the hearing, and after it appeared beyond dispute that the defendant had no notice that a levy was to be made, and was absent when it was made.

\*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*

The report finds,—"And I recommend that the whole of said premises be assigned to said Barney, he paying to said Leeds, or securing to him in such manner as the court may order, the sum of $500 and interest thereon, unless said Leeds shall pay to said Barney, or secure to him in such manner as the court may order, the sum of $300 and interest thereon, or $100 and interest thereon, whichever of said sums the court shall direct; in which case I recommend that the whole of said premises be assigned to said Leeds."

It further finds,—" If said Barney's opinion as to the value of said premises in 1866 was not competent, I then appraise the same at six hundred dollars only." Aside from the testimony of the plaintiff, there was no evidence before the committee tending to show that the premises were worth over $600 on September 22, 1866. The plaintiff testified that he had known the property for at least twenty-two years; that property in that locality was, in his opinion—there was no claim that he was an expert—worth the same at the time of the levy, but that these premises had since he first knew them depreciated $200, and were, in his " opinion," on September 22, 1866, worth $400 more than the appraisal—the levy which he accepted and under which he claims. The report shows that the committee made a discount of fifty per cent. ($200) on the plaintiff's testimony.

We insisted then, and do now, that upon this point it should be rejected altogether.

The plaintiff levied upon the premises. The officer delivered seizin

of the land. The plaintiff, with full knowledge of all the facts, accepted the same. The officer made his return, and the extent was recorded.

I. By these proceedings the premises passed to the plaintiff, subject to the defendant's rights. The plaintiff's rights rest entirely upon and are measured by his extent. He cannot be permitted to impeach it, or any part of it. The law prevents him from kicking down the stairway by which he reached the title. He must stand or fall by this extent as a whole. He cannot stand upon one part, and repudiate another. He cannot blow hot and cold with the same breath. If he takes the benefits of the extent, he must take them *cum onere*.

Whatever may be the rule as to the form of the remedy, the rights of the parties, as this court has twice decided in this case, must be determined by the laws in force on September 22, 1866. *Barney* v. *Leeds*, 51 N. H. 262, 285, 286.

It is immaterial *now* what the appraisers had in their minds, or intended to do in relation to reversionary rights; and for the purpose of the present inquiry it is of no consequence whether they could have made the levy in some other form or mode or not.

The meaning, the construction, of the terms of the levy is not an open question in this court.

"They [the appraisers] appraised the whole estate at $600, the debtor having an exempted estate therein of the value of $500; and the appraisers thereupon set off the whole land by metes and bounds at that sum, in part satisfaction of the execution." *Barney* v. *Leeds*, 51 N. H. 285.

The question was raised and argued by counsel, and carefully considered by the court. The court decided that in their extent the appraisers appraised the "entire premises" at $600; and the question here is, whether this plaintiff can *now* contradict his own levy. It is apparent that an extent without an appraisal would have been a nullity. It is self-evident that by their extent these appraisers did appraise $600 as the "just value" of the entire premises—if their words mean anything. Gen. Stats., p. 443, sec. 1; *Mead* v. *Harvey*, 2 N. H. 496–499; *Hovey* v. *Bartlett*, 34 N. H. 281. Can the plaintiff, then, impeach a vital part of the extent under which he claims, by showing it to be false? He cannot attack the description given in the levy, and show that more, other, or different lands were set off to him. He must bring himself within the terms of his paper title. He is estopped from impeaching the judgment of his appraisers as to the value of the premises. As to him, the value is a part of the description, and is a statute requisite. He has embodied in his levy a description of the defendant's rights and the measure of them in value, and this court in this case has decided that he is estopped from impeaching the extent in these particulars. Neither of the items which make up the $600 can be impeached without a practical repeal of two statutes.

In *Pratt* v. *Jones*, 22 Vt. 341–344, where the judgment had been "satisfied by levy of execution upon real estate," the court (RED-FIELD, J.) say,—"We think, then, in conclusion, that the record and

the record only must be held conclusive, until, by some proceeding brought to operate directly upon the record itself, the levy is avoided." *Ib.* 345; Co. Lit. 168 *a*, 171 *a* (sec. 258), 352 *a*; 4 Kent Com. \*368; *Green* v. *Bailey*, 3 N. H. 34, 35; *Burnham* v. *Coffin*, 8 N. H. 119, 120; *Thomas* v. *Platts*, 43 N. H. 629; *Howard* v. *Daniels*, 2 N. H. 137; *Angier* v. *Ash*, 26 N. H. 105, 106; *Fletcher* v. *State Capital Bank*, 37 N. H. 401; *Ladd* v. *Dudley*, 45 N. H. 66; *Hinesley* v. *Hunns*, 5 Harr. (Del.) 236, 238, and cases there cited.

Justice—the principles so clearly stated in *Horn* v. *Cole*, 51 N. H. 289–300—demands that the plaintiff should be estopped by his acts in this case. He elected to proceed in a certain mode. He should be bound by that election. Practically he selected his own appraisers, and should be "concluded" by their judgment. Any other rule would open the door to fraud and loose practice. In all cases where the debtor occupied a homestead, the creditor, by putting down the appraisal through the medium of his men of straw at the levy, and their carrying it to the other extreme by his own "opinion" at the partition, would take the whole, as the monkey did the cheese. In this case the three appraisers, on September 22, 1866, appraised the entire premises for more than we think they were then worth. Undoubtedly they are worth something more now. When this petition for partition was entered, the plaintiff claimed that all should be set off to him except what should be appraised as of the value of $500 at the time of the partition. Why, if he did not expect to gain by it? We denied the soundness of that view. He carried the question at once to the full bench. The law term decided that question against him. He forthwith shifts drag-ropes, changes ends of his teeterboard, and swears that in his "opinion" there has been no change in the value of the property for more than twenty years. We are not aware of any evidence before the committee, tending to show that at the date of the levy the premises were worth over $600, except the opinion of the plaintiff. As we understand the finding of the committee, it is, that the appraisal at the levy must stand, unless the "opinion" of the plaintiff is to govern. It seems to us that the position claimed is wholly without warrant, either in principle or precedent, and that, if held to be well founded, it will prove worse than a Pandora's box of mischief.

Sweating the coin of the realm was formerly a high offence. We trust this court will lend no encouragement to fraud and perjury, by allowing parties to sweat away homesteads at partition by impeaching their own levies and contradicting their own acts in affirmance of their statute title.

It seems to us that the view we have taken is distinctly affirmed in the second opinion delivered in this case, and is the direct and logical sequence of the principles established in both.

II. For convenience we will now consider objections 6, 7, 8, 9, 10, and 11.

No light can be drawn from the practice in the mother country or

our own prior to the adoption of the constitution in 1792. The doctrine of parliamentary omnipotence has long prevailed in Great Britain, subject to two theoretical restraints. Until 1784 the legislative assembly in this state exercised sovereign authority. From the existence of the colony until years after the revolution, partition was made, in a very large proportion of cases, by the general assembly upon a private bill. The same was true of decrees of divorce, as shown by us in the argument in *Swett* v. *Swett*, 49 N. H. 264, until after 1784. The legislature restored parties to their law by private bill until 1818. *Merrill* v. *Sherburne*, 1 N. H. 199; *Ashuelot R. R.* v. *Elliott*, 52 N. H. 400.

Legislative partition, divorces, and restorations to law are clearly prohibited by our constitution. The provision, that " Where any estate in houses and lands cannot be divided among all the children without great prejudice to or spoiling of the whole, being so represented and made to appear unto the said judge, the judge may order the whole to the eldest son, if he accept it, or to any other of the sons successively upon his refusal, he paying unto the other children of the deceased their equal and proportionable parts or shares of the true value of such houses and lands, upon a just appraisement thereof, to be made by three sufficient freeholders upon oath, to be appointed and sworn as aforesaid, or giving good security to pay the same in some convenient time as the said judge shall limit, making reasonable allowance in the *interim*, not exceeding *six per cent. per annum*," was first fully introduced in this state in 1715, though recognized in 1692. It applied in the settlement of estates to probate courts alone. During the existence of the provincial government, that part of the jurisdiction of the ecclesiastical courts relating to the settlement of estates was in general conferred by the general assembly upon judges of probate, with an appeal to the governor and council as the supreme court of probate.

The revolution and the adoption of our constitution cut up the ecclesiastical jurisdiction, as such, by the roots. When the general assembly conferred the power upon the probate courts alone, they conferred a power which they exercised themselves as they did the power to decree divorces and " restore " parties to " their law," though we have yet to learn that they attempted to compel an execution debtor to sell his real estate at a price fixed by them to another person, as a penalty for not buying another's land which he did not want and for which he was unable to pay. It is worthy of remark, that the power of assignment under the " prejudice " clause was never conferred upon a court of law until the Revised Statutes, a century and a quarter after. Claiming general jurisdiction in partition, such causes swarmed past the probate court into the general assembly, and took up so much of the time of that body in " private affairs " to the detriment of other business, that more than a century ago they attempted to close their doors by handing the whole subject over to the probate court. Nevertheless, as one legislature could not bind another, the general assembly exercised jurisdiction in partition in a variety of forms until after the revolution. But

no attempt was made to compel a defendant to buy land which he did not want and which he could not pay for, until January 1, 1868. The commissioners of revision reported the following section : " Sec. 25. When any estate is so situated that it cannot be divided so as to give to each owner his equal share therein without great prejudice or inconvenience, the same or part thereof may be assigned to one of the petitioners, he paying to the other persons interested, who shall have less than their shares, such sum of money as the committee shall award, or giving bond with sufficient sureties to pay the same with interest within such time as the court shall order." See Report of Commissioners, 1867, p. 613. This provision was amended by striking out the word "petitioners" and inserting the word "owners." See Supp. Rep. of Commrs., p. 11, bottom of page.

\*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*

There is nothing indicating that the commissioners regarded this as a "material" change. Prior to the General Statutes, the chapter on partition was a hybrid agglomeration. The hotch-pot was not made. It was created or grew into form as the result of accretion and injection. This court, in *Abbott* v. *Berry*, 46 N. H. 369, in 1866, held, practically, that it was impossible to execute the statute as written. The commissioners had modified its provisions, conforming in some respects to the opinion of the court. Colonel Tappan, not having before him the changes they had made or the opinion of the court, caused the word "owners" to be inserted in a single section, leaving the rest untouched. Our position is, that this section as modified is open to every objection in that opinion, besides others of a more grave character. It puts it in the power of a committee to compel one person to buy the share of another, when the other provisions of the act provide no mode of ascertaining, defining, or setting off that share. The principle must be the same, whether there are a thousand defendants or only one. The act provides for ascertaining, defining, and setting off the shares of those who petition, and there it stops. The court ought not to fill the gap by construction.

But, if the court should adopt a different construction, we say the act cannot apply in this case, for the following reasons : (1) the defendant's rights were acquired long prior to any changes in the law. He holds his homestead rights under the act of 1851, and they were perfected by the levy, September 22, 1866, more than fifteen months prior to the General Statutes. The court, unless forced to do so by its language, will construe the statute as prospective and not retrospective ; (2) the rights of the defendant, as this court has decided, were "vested" in him prior to the General Statutes. A vested right cannot be destroyed by a change in the form of the remedy. Of course, we do not claim that every change in the remedy is in violation of the constitution. As we understand it, a change of the remedy merely is not unconstitutional ; but a right cannot be taken away by calling the process pursued to destroy it a remedy. Here the rights were vested, and the statute undertakes to take them away by burdening him with a new condition, to

wit, that he shall not have them unless he will buy another man's property, which he does not want and for which he cannot pay. If this condition can be imposed, others may be. It seems to us that upon both points the decision in *Rich* v. *Flanders*, 39 N. H. 304, is decisive in our favor.

We take the broad position that we cannot constitutionally be compelled either to buy real estate of another, or to sell that which we own, at the appraisal of men, to an execution creditor who has levied upon the balance of it. We have no occasion to discuss the constitutional powers of the probate court in the settlement of estates under the "prejudice" clause. They have a history and a foundation of their own. Nor have we any further occasion to discuss the power exercised by the general assembly over divorces, restorations to law, or in matters of partition, prior to the adoption of the constitution. They have all been repudiated by the courts. A plaintiff has the right to levy upon the lands of his debtor. He has an enforced ownership of them; but because he owns a part of the land once owned by the defendant, he does not acquire a right thereby to compel the defendant either to sell his land to the plaintiff, or to buy the plaintiff's land at the appraisal of men. The law will compel people sometimes to perform their contracts. It may enforce a trade, but it never makes a trade for those who have not made one for themselves. That is beyond the scope of both judicial and legislative authority. The exact position of the plaintiff here is, that, because he has acquired a title to a part of the defendant's land, he can compel the defendant to sell the rest to him. A man holds his property by no such uncertain tenure. He may be compelled to pay his debts. The public may take it from him to pay his taxes, or for public uses upon "just compensation;" but nothing can be clearer than that A cannot be compelled to sell his farm to B, either with or without "just compensation." If they were merely adjoining owners, no one would think of disputing the proposition. It is an axiom, that one man's private property cannot be taken from him and given to another, either with or without "compensation." If the plaintiff in this case had made his levy by "metes and bounds," no one would have pretended that he acquired the right or power to compel the defendant either to buy or sell. How can he acquire such right by indirection—by changing the mere form of his levy? He has no such right. If he has it, every creditor practically has it in his power, in almost every case of a levy upon a homestead, to compel the debtor to part with that which the law gave him—a home—his "castle, which the king cannot enter."

III. We will now consider the remaining objections.

The plaintiff could have proceeded in equity, which adapts its forms to the special relief sought. We are not to be punished because he failed to do so. The court, in the first opinion in this case (51 N. H. 281), said that either party might proceed under sec. 1, ch. 228, Gen. Stats. This nobody denied. But it does not follow that the court undertook to settle the construction of all the other sections in the

chapter, in their bearing under the homestead act of 1851, or every question that might be raised in this case under both. The guarded language of the court shows this. It is apparent from the opinions that the court anticipated that questions might arise in this case which they did not intend to decide. So far as we remember, the opinions invariably say that the committee may set off the estates of the parties by " metes and bounds." That the court had the power to put the judgment in these cases in the form they did is beyond dispute. Whatever else may be said, it is clear that the committee has not followed the words of the judgment. Aside from the particulars which we have discussed, the act for partition was in force long before the homestead act was passed. If they are inconsistent so that they cannot be reconciled, the former must give way to the latter. The primary purpose of the homestead act was, to secure the debtor, and, through him, his dependent family, a home which could not be taken away from them except through the joint act"of the husband and wife, or in case of her death, that of her husband and the judge of probate.

The construction for which the plaintiff contends would defeat the entire purpose of the law, and in cases like the present would nullify or repeal it. A case will illustrate : A owns a homestead worth $600, and owes fifty men $100 each. B, his first creditor, levies, and under the " prejudice " clause turns A and his family out of doors, unless he pays him $100 and costs. A pays up. C then follows the example of B, and each of the others in due time follows suit. When he pays up each levy, the estate represented by it is not exempt from attachment, and he is compelled to pay from $5000 to $6000 in order to secure an exemption of $500. What a glorious protection such an exemption would be ! The law says it shall not be taken away from him unless by the joint action of himself, his wife or her representative ; and yet, under the construction claimed, every creditor has the right to take it away from them all without anybody's consent. Sec. 3 of the homestead act provides that the debtor, in the contingency therein named, shall have the right to have " set off, by metes and bounds, a homestead of the estate of the debtor such as he may select," etc.

Within the limits prescribed by the law, the debtor has a right to " select " the spot to be exempted for his home. Of what account would this right of selection be if every creditor had the right to destroy it under the " prejudice " clause, as could be done in nine cases out of ten when the homestead exceeded $500 in value ? Our position is, distinctly, that the " prejudice " clause is utterly inconsistent with the homestead act, would defeat its chief purpose, and has no application where a homestead is to be set off. Nothing short of this can give the debtor or his family any adequate protection. We had occasion in a former brief in this case to express our views in relation to the general character of the homestead legislation, and have in nowise changed them. It was, as we then showed, the work of different minds, and necessarily incongruous.

Its framers were like necessity : they knew no law, but they pro-

posed to create one. Their jealousy of the legal profession has made the act a puzzle which has bewildered the profession, sapped the pockets of suitors, and drawn heavily upon the time and patience of the court. But in the respect to which we are about to call the attention of the court, we regard the bill as complete within itself, and *exclusive* in its character and in the nature of its remedies. We had occasion to show in our former brief that the proviso of section 3 was the work of Mr. Quincy, and that the remainder of that section was taken almost bodily from the select committee's bill No. 5. We had then occasion to call the attention of the court to the dogged tenacity of Mr. Pierce, one of the pioneers of the bill, and to the fact that his purpose finally dominated in all the essentials of it. Section 4, as it finally passed, was inserted at a late day upon his motion. The pivotal idea is the same as in section 2 of the bill introduced by him. Section 3 applies in terms to those cases only where the debtor, &c., applies to have a homestead set out to him. We contend that section 4 applies in all cases where the debtor, &c., makes no such application. Neither of these sections covers the entire ground alone, but taken together they do. The debtor in this case made no application under section 3. In fact, he never had the opportunity; but that is immaterial. If the debtor, &c., failed to make any application under section 3, it becomes the sheriff's duty, so far as any action under the "prejudice" clause may be concerned, to proceed under section 4. The words were general and imperative under section 2 of Pierce's bill, and the duty must be regarded as equally so under section 4. Section 4 was not inserted in the bill as the tail end of section 3. It conserves and preserves intact the main purpose of the act. With this view, it was the duty of the appraisers at the time of the levy to determine whether the "house and lot" could "be divided without injury and inconvenience," and if so, to take the proper steps which would result in a sale, &c. The court is bound to presume that they did what it was their duty to do. They have made no such finding. They must be presumed to have passed upon the question as to whether the premises could be divided without "injury and inconvenience;" and our position is, that, inasmuch as they have made no such finding, the plaintiff is estopped from making any claim under the "prejudice" clause. So far as his remedy where the premises cannot be divided is concerned, it was his duty to have raised it under section 4, when the levy was made. If he failed to do it, which is not to be presumed, it is not our fault. The election was open to him, and he must be bound by it. If the time has passed, he cannot be heard to complain, if, in stretching too far for the power of destruction, he has lost the ample remedy he had in his hands.

Had the appraisers on September 22, 1866, found that the "house and lot" "could not be divided without injury and inconvenience," and ordered steps to be taken for a sale, etc., it is quite clear that the plaintiff could not have proceeded under the "prejudice" clause in the act for partition. He would be "concluded" by the finding of his

appraisers. It would seem to be self-evident that he would be equally "concluded" if they had made a finding the other way, or, what was equivalent to it, proceeded to appraise and set off, as they did in this case. If this view is correct—and it seems to us unanswerable—the only question can be, whether section 4 is really a part of section 3, and has no effect except where the debtor, etc., makes an application. Such a proposition would certainly be a reversal of the history of the law, and a nullification of its paramount purpose. *Gunnison* v. *Twitchel,* 38 N. H. 69.

The very title of the act shows that its purpose was "to exempt the homestead from attachment, levy, or sale." The act not only twice does this (see *Gunnison* v. *Twitchel,* bottom of page 70), but provides that "such homestead shall not be assets," etc., "nor subject to the laws of distribution," etc., and that "no release or waiver of such exemption shall be valid, unless by deed," etc. "By its express terms it exempts the homestead * * from the operation of the laws for the compulsory payment of his debts." *Norris* v. *Moulton,* 34 N. H. 395, 396. To preserve the home, the law prohibited any levy or sale of it, and did not give by indirection the power to destroy it, which it had expressly denied. The home could only be destroyed in one way, for which the act provided in section 4, and that was by a sale so hedged about with restrictions that another homestead could be secured. In other words, it provided that, if the defendant did not make an "election," he must exchange his homestead right for another, or for money which would purchase another. This being the sole provision in the act by which his homestead can be taken from him against his will, it must, on well settled principles, be held an *exclusive* and not a cumulative remedy. The plaintiff has his property now, all that the law gave him, and is simply deprived of the power to take away another's. If proceedings are had under section 4, and a sale results, the defendant has still $500 in money with which to buy another homestead; and this money is exempt from attachment and levy long enough to give him ample opportunity to purchase another home. But under the other provisions of the act he has no such right, and the court cannot import such right into them, unless it holds that all the provisions in relation to selection, &c., apply under all the provisions in the act.

We take it to be too clear for argument, that, if the defendant in this case could be compelled to take the $500, it would at once be subject to attachment and levy, whether in money invested in personal property or real estate. No provision of the statute exempts it. He is a widower, living alone upon the premises. That he may retain the homestead so long as he occupies it without a family, this court has already decided. It has also decided that under this act a man cannot *acquire* a homestead unless he has a family. The court in the first opinion drew the line between acquiring and retaining so distinctly that no man can misapprehend it. The defendant's rights were acquired—became vested—in 1866. He cannot by marrying again hold by relation

back to that time.  The general principle has rendered that impossible. But if it had not, the legislative knife has.  A new act has come in force.  Whatever he acquires, he must acquire and retain under that act.  See ch. 1, secs. 33, 34, 35, 36, 37, Laws of 1868.

No other act can have any application to the case.  It is, to say the least, very doubtful whether, under the laws of 1868, any married man has any homestead right; and it would seem to be still more doubtful whether one who is not married could acquire a homestead under the terms of that act.  The law does not assume to relate back.  It bridges no chasm, and has no provision for a case like this.  The plaintiff really proposes to shorten the candle at both ends until he snuffs it out.  Unless this court make a new homestead act out of whole cloth, if the defendant can be compelled to sell, his " vested " homestead right must be destroyed—cut off beyond redemption.  How great a blessing such a "vested " right, which could not be taken away from him except by his own consent, would be, we leave for others to decide.

Quirk, Gammon, and Snap might think the law was designed for such purposes, but we trust this court will not.

Foster, J.   The plaintiff, as a creditor of the defendant, caused the estate of the latter to be set off on execution.   The entire value of the premises, including the homestead right, was appraised by the committee at $600, and they were set off to the creditor, " subject to a family homestead."   As the result of these proceedings, the parties became tenants in common.

Upon petition by the creditor for partition, the court decreed that the committee to be appointed to make partition should assign to the debtor so much of the estate as they might find to have been of the value of $500 on the day of the completion of the levy thereon, September 22, 1866.  *Barney* v. *Leeds*, 51 N. H. 254.   By agreement of the parties, N. B. Felton, alone, was appointed a committee to make partition.   That committee has made his report, wherein he finds that the premises cannot be divided without great prejudice.   He also finds that the value of the whole, September 22, 1866, was $800, or $200 more than the value appraised by the committee on that occasion. Upon the question of the value of the premises, the plaintiff was permitted to testify, subject to the defendant's exception; and the committee reports that if the plaintiff's opinion in reference thereto was not competent, then he appraises the premises at $600.

The first question, therefore, naturally presented, relates to the competency of this testimony, concerning which the committee reports as follows:

" To qualify himself to give his said opinion, said Barney first testified that he had lived in the village in which said premises are situated for twenty years and over last past, and knew said premises in 1866, and about the time of the completion of said levy bought and sold similar real estate situated in said village, and near said premises, and had known other similar real estate in said village bought and sold by

other persons about the same time, and at other times, and the prices at which the same was bought and sold."

We think the plaintiff's testimony indicated that he was abundantly qualified to express an opinion as to the value of the property, and if he was a competent witness concerning the subject upon other grounds, there was no error in the reception of this evidence.

But the defendant contends that the plaintiff is estopped by the proceedings of the extent upon which his title depends (a part of the machinery of which was a legal appraisal of the whole estate at $600), to aver a fact, or express an opinion, at variance with the result of that appraisal.

This position, if not technically correct, is so far practically sufficient for the defendant's case that the judgment of the appraisers upon the levy of the execution must be regarded as a conclusive determination of the value of the estate at that time. Although a man cannot probably be precluded by the doctrine of estoppel from entertaining and even expressing an opinion merely, that opinion is of no consequence if not available as evidence.

The appraisal was the solemn adjudication of the tribunal appointed by law to assess the "just value" of the premises. Comp. Stats., ch. 201, sec. 1; *Mead* v. *Harvey*, 2 N. H. 496; *Hovey* v. *Bartlett*, 34 N. H. 281.

It is as conclusive as a judgment rendered upon a legal verdict, and cannot be attacked in this way. The record must be held conclusive, until, by some proceeding brought to operate directly upon the record itself, the levy is avoided. *Pratt* v. *Jones*, 22 Vt. 345.

A petition for partition is not a proceeding to impeach, revise, or vacate the record of a former legal proceeding. A judgment, "so long as it stands in force, *pro veritate accipitur*, and cannot be contradicted." Co. Lit. 168 a; *Ladd* v. *Dudley*, 45 N. H. 61, 66.

In *Fletcher* v. *The State Capital Bank*, 37 N. H. 369, at page 401, SAWYER, J., says,—"The return of the officer and the certificate of the appraisers embodied in it or accompanying it, and thus constituting an essential part of the return, which makes the record title, so far as it sets forth their acts and proceedings required by law in making the extent, must be held to be conclusive when set up by one claiming title under the extent. The case falls within the general doctrine in relation to the returns of officers upon process, that as to the parties, and those claiming as privies, and all others whose rights and liabilities are dependent upon the proceedings, the return of matters material to be returned is so far conclusive that it cannot be contradicted for the purpose of invalidating the proceedings or defeating any right acquired under them. And the principle, in its application to the return of an extent, derives a double support from the record nature of the title acquired, and the infinite mischief that must result from holding that as such record title of real estate it is open to the uncertainties of parol proof, in reference to the acts and doings of those whose proceedings are essential to its validity." The proposition here is to show

by parol that the appraisers erred in their judgment as to the value of the estate set off. Upon that question, in the absence of any proof of fraud, their judgment is conclusive.

But the defendant insists that the court has no power under the statute to require either one of these parties to sell or purchase the surplus of the estate after the assignment of the exempted portion.

The position is, — 1. The court, in passing judgment upon the former case, reserved between these parties, and reported in 51 N. H. 287, prescribed and directed that partition should be made between these parties " by metes and bounds," and not otherwise.     2. By virtue of the homestead act, Comp. Stats., ch. 196, the *whole* estate cannot be assigned either to the creditor or the debtor, except under the provisions of section 4 of that act, which it is said apply only to the case where the debtor does not make application to have his homestead set out, as provided in section 3.     3. Since the homestead act provides in section 3 for setting out to the debtor a homestead such as he " may select," it follows that, if he does make such application and selection, he is entitled at all events to have and to hold his homestead in severalty, and cannot be compelled to sell it to his creditor, for the reason that it cannot be conveniently divided and set off by metes and bounds; and as the result of all this, that, in a case like the present, where the estate cannot be divided, no partition can be had : hence the conclusion would seem to follow, that the party entitled to the homestead is also entitled to all the rest of the estate.     4. If the statutes relating to partition do not subserve this view of the law, they are unconstitutional.

These views are advocated in an able, lengthy, and ingenious argument; but whatever weight may be due to the argument or to portions of it, we fail to recognize and cannot reach the result indicated by the defendant's counsel.

In the first place, with regard to the purport of the judgment pronounced in the former case (51 N. H. 287), we think it ought to be as manifest to the learned counsel as it is certain in the minds of the court, that neither the court as a body, nor the author of the opinion, ever for a moment entertained the idea of directing that partition should *not* be made otherwise than by an actual setting out of a portion of the estate to each party by prescribed metes and bounds, provided it should turn out that the estate was practically incapable of such a division.   That contingency was not contemplated or suggested, nor, indeed, was any formal order or judgment concerning *the method of partition* made; but the court, quite naturally, followed the language of the statute in suggesting that the committee " should [not *must*] assign to the defendant by metes and bounds " his interest in the premises *at the value existing on the date of the levy*,—the only question raised by the case being simply as to the date of the computation of that value.

We have recently had occasion to reiterate and affirm the settled doctrine, that in this country the power of compelling partition is in-

cident to all estates held by tenants in common. In this state it is matter of right, and does not require equity for its enforcement. 1 Washb. Real Prop. 581; *Morrill* v. *Morrill,* 5 N. H. 136; *Hoyt* v. *Kimball,* 49 N. H. 322, 328.

We fail to discover in section 4 of the homestead act any limitation of the provisions of the section to the case only in which the debtor has made application to have the homestead set out to him, nor does any reason for such limitation occur to us; neither can we regard the plaintiff as estopped to ask for partition, by his failure to pursue the remedy given him by section 4, which remedy was not indicated by the form of the proceeding adopted by the appraisers at the time of the extent. We do not regard the form of the appraisal and extent, namely, an appraisal of the estate at $600, and the setting off the creditor's interest in the same as of the value of $100, subject to the debtor's right of homestead therein, as any indication of opinion, much less a formal judgment of the appraisers, that the estate was incapable of partition.

Now this estate is found to be incapable of partition by metes and bounds, and the debtor is entitled to his homestead,—but just as much is his creditor entitled to the payment of his honest demands out of the residue of the estate; and we cannot conceive that the homestead act was ever intended to receive a construction that should enable a dishonest debtor to hold, exclusively, a large estate, including a homestead which could not be conveniently separated from it, without yielding up something to the creditor by way of equivalent for the surplus estate.

The law intended a favorable regard for a poor debtor, but not immunity and protection for a dishonest one. In providing for the debtor's relief, it does not ignore the creditor's rights. But the defendant insists that he ought not to be compelled to sell his own homestead right, which is absolutely secured to him by the law, nor to purchase contrary to his will the residue of the premises. And there is very great cogency in the suggestion. However it may be in this particular instance, a case may readily be supposed in which such a requirement would be, if not impossible of execution, at least productive of great hardship and injustice. Suppose a piece of real estate absolutely incapable, in the judgment of the court's committee, of division, and worth $20,000, the property of two brothers, derived by inheritance from their father, and that neither of them has any other property: the right of both to have partition, so that each may have and enjoy his estate in severalty, is beyond question to be regarded as the law in this state. This right, of course, is and must be qualified so far as this,—that if the estate is absolutely indivisible, an actual share or part of the premises cannot be given to each. But in the recent case of *Crowell* v. *Woodbury,* 52 N. H. 613, 615, it was shown that "long before any court having general chancery powers was established in this state, the concurrent jurisdiction of equity, in making partition of land held in common by coparceners and tenants in common, had become perfectly established,"

and that since 1832, when full equity powers were conferred upon the court, the nearest practicable approach to a literal division of the thing itself may be secured by an application of the modes adopted by courts of equity to effect the object,—that is, by decreeing a sale of the whole and a division of the proceeds, or such other means as are appropriate to the special circumstances and situation of each particular case. This makes it certain that the right to a partition is sustained.

But nothing can be clearer than that an assignment of the whole to one, and an order that he shall pay to the other the estimated value of his share, is no partition at all. It is, in effect, a forced sale of the share of one to the other,—a compelling of one to purchase the portion of the other, whether he wants the property or not, and whether he has the means to buy it or not, at a price which he has nothing to do with fixing.

It is thus observable that serious and, as it seems to me, insuperable difficulties, both practical and legal, stand in the way of giving to sec. 25, ch. 228, Gen. Stats., a construction whereby such forced purchase is compelled.

Now, in the case supposed, of the two brothers, who have inherited an indivisible estate of large value, and who have no other property, the whole being assigned to one against his will, a debt of $10,000 is imposed upon him against his will: how is he to pay or secure it? He may, perhaps—not certainly—if he so chooses, make security by way of a mortgage of the whole. But suppose he objects to the burden of so large a debt, and declines to execute the mortgage: what then? The other party must sue the judgment, and, there being no other property, he must seek security by an attachment of the whole estate which has passed to his brother by force of the judgment upon the so-called partition. A levy of an execution makes the parties tenants in common again, inasmuch as the premises cannot be divided—Gen. Stats., ch. 218, sec. 8 ; and the parties find themselves at last just where they started, except that they have incurred the expense and annoyance of fruitless litigation. All this is but folly, injustice, and oppression.

We are therefore of the opinion that the statute under consideration (Gen. Stats., ch. 228, sec. 25) is capable of no other construction, when applied to a case like the present, than that the whole estate may be assigned to one party, provided he is willing to take it, he paying the other party the sum awarded by the committee; and that in all cases where division by partition under the statute cannot be made, by reason of the nature and situation of the property, the parties are left to the ample, flexible, and more appropriate remedies of equity, whereby the entire estate may be sold, and the rights of the parties settled and determined upon equitable principles.

The plaintiff may, if he chooses, pay to the defendant $500, with interest from the date of the levy, whereby the defendant will receive the value of his homestead right; or, the defendant (who may have the

right of election in this matter) may purchase of the plaintiff the surplus of the estate at the price of $100, with interest from the same date.

The report may be recommitted for amendment in accordance with these views, and, if the parties act upon the foregoing suggestions, there may be judgment on the report as thus amended. Otherwise this petition

*Must be dismissed, and the parties left to seek relief by proceedings in equity.*